law, where, by a reasonable interpretation, such bonds can be made to meet the intention for which they were required and taken. Where the party has had all the advantages of making the bond, the court can not aid him to avoid its obligations, by adopting strained and rigid maxims of construction.

Judgment must be given for the plaintiff.

---

178]    *Smith *v.* Goddard.

Contract to pay two hundred dollars in current bank notes is a contract to pay in money, if bank notes be not tendered at the day.

An action of assumpsit was brought in the common pleas of Greene county, upon a promissory note in the following words:

"I promise to pay Abbott Goddard, or order, at Xenia, two hundred dollars, in current bank notes, such as are passing in the common course of business, on or before the first day of June, 1822—value received this 25th March, 1820."

The defendant pleaded non assumpsit. Upon the trial the plaintiff gave the note in evidence to the jury; and the defendant then offered evidence to prove that at the time the note was given, the circulating medium of the country consisted of bank notes, passing at a discount of from twenty-five to thirty-three and a third per cent., and of a few bank notes passing at par with specie. That on the first of June, 1822, depreciated bank notes had ceased to circulate, and that no bank notes were in circulation but those which passed current at the amount called for, as specie. To this evidence the plaintiff objected, and it was rejected by the court of common pleas. The defendant excepted to this opinion, and a writ of error was allowed. The question was reserved by the supreme court in Greene county, for decision here.

B. Collett, for the plaintiff in error:

1. The language of the contract imports that other currency was intended than specie or bank notes passing as specie, for the sums of money apparently due on the face of the notes.

2. Parol evidence is admissible to show to the court the subject
188

Smith *v.* Goddard.

matter of a written contract, unless it be for the payment of lawful money, or the damages be assessed by express stipulation in the agreement.

3. Parol evidence is admissible to show and explain a latent ambiguity in the contract.

A contract is an agreement between two or more persons to do or not to do an act for a sufficient consideration. The word agreement, in the definition, imports that there must be a mutual understanding—a consent of the parties relative to the act to be done. If there should be a mistake—if the vendor intend to sell one article, and the vendee believe that he is purchasing another, a contract is not *made, there being no mutual consent or agreement of the [179 parties, which constitutes the essence of the contract. To elicit the *intention* of the parties, the rules of evidence have been established.

The language of the contract imports that other currency was intended than specie or bank notes passing currently at par with specie. In the construction and interpretation of an agreement, courts will take cognizance, without the testimony of witnesses, of those facts of notoriety which compose a part of the public history of the country. This is a source of information on which the judges can rely with more certainty than on the statements of witnesses liable to mistake, to forgetfulness, and to be swerved from the truth by partiality. The fluctuations and changes of the circulating medium are the subjects of daily observation among the people in general. In this the value of their property is estimated—all buying and selling conducted. They are liable to be mistaken with respect to other public transactions in which they are not immediately interested, but on this subject their information is not only widely diffused, but accurate. We will advert to the history of the currency of this country, as to facts of which they will take cognizance independent of the testimony which was proposed. From the commencement of the settlements in Ohio, until the year 1815, the currency consisted of gold and silver coin authorized and made a tender in payment of debts by acts of Congress, and also of bank notes, redeemed on presentation in specie, and consequently passing currently for the sums of money expressed to be due by the notes.

In the ordinary course of business bank notes or coin, at the election of the debtor, were tendered and received by the creditor with-

189

·out distinction or hesitation. Nothwithstanding bank notes were not a tender by act of Congress, such was the facility with which specie could be procured for bank notes and their equality in value, that both species of currency were contracted for by the expressions "the sum of —— dollars," or lawful money of the United States. No distinction was made between them in the phraseology ·of agreements.

The parties to this contract, by the expressions, "to be paid in ·current bank notes such as are passing," could not have intended bank notes equal in value to specie, for they have departed from the ordinary expressions used in notes or obligations where specie or its equivalent, specie-paying bank notes, are intended. This inference is confirmed by a reference to the words of the agreement —"such as are passing in the ordinary course of business."

180] *Another and a different criterion than that of the redemption of the paper in specie by the banks on presentation, or that the notes shall be equal in value to specie in the sum due by the terms of the contract, is made the rule by which the paper to be paid in discharge of the contract shall be tested. Men do not make a distinction in their expressions of contracting, unless there be a real and substantial, and not an imaginary difference. They do not establish one rule of testing the property to be delivered pursuant to a contract, when another was contemplated. It is not a necessary conclusion, that by the words current bank paper, gold and silver coin or its equivalent was intended. If we be correct in the exposition of this contract, that another description of paper either was or might have been intended than bank notes equal in value to the sums for which they were payable, parol evidence must be introduced to show to the court the value of the current bank paper to which the contract has reference.

This contract affords internal evidence that another description of bank paper was intended than specie-paying bank paper, when ·considered with regard to another part of the history of the currency of this state, equally public and notorious. The natural tendency of substituting a paper currency, unlimited in its quantity from the numerous banks chartered by the legislature, but necessarily limited in its circulation to the western country, was to banish the gold and silver coin from the country. Inasmuch as bank notes, for the purposes of internal trade, are equivalent to specie, the coin was immediately removed and employed in foreign trade. Our

banks became unable to redeem, on presentation, their notes in specie. Their credit and value gradually decreased. The small quantity of specie remaining in the country was either confined in the vaults of the banks, or under lock and key in the chest of the miser. So difficult was it to procure specie, that Congress were compelled, from session to session, to extend the time of payment to their debtors in the land office. No alternative remained. The people were compelled to continue depreciated paper as the circulating medium, or barter one article of personal property for another. Depreciated bank paper continued, for a period of several years, the currency of the western country. It was received by the merchant for foreign merchandise, for labor by the mechanic, and by the farmer for the produce of the soil. In this currency was estimated the value of all property, real and personal.

As this description of property constituted the circulating medium *of the country, when the parties to a contract adopted [181 the phrases, "a sum of money," "a sum in dollars and cents," without adding explanatory words, the presumption was that the parties intended the ordinary currency, depreciated bank paper. The word money, as well as dollars and cents, included in its definition, as understood by the people, depreciated bank paper, gold and silver coin, and a few bank notes passing as specie for the sums expressed to be due on their face. And because the relative proportions of depreciated bank paper to coin and to bank paper equivalent to specie was more than ten to one, courts of justice, in the interpretation of contracts, will adopt the popular meaning of the words rather than a technical or classical definition. It is beyond the power of the most absolute despot to compel the people by law to change the meaning of a word used in common conversation. Julius Cæsar, no less eminent as a scholar than as a statesman and warrior, who gave laws to Rome, complained that he could not either introduce a new word or change the meaning of a term in the language of the people. This is a right which the people will exercise, and which, it appears, they will not delegate in a republic or surrender to a monarch. Peake's Evidence, 112, note V.

In the 1 Tyler, 382, Vermont, a contract in writing for the payment of a sum in dollars and cents, parol evidence was admitted to prove that United States bank bills were intended, this going to explain, not to controvert, the contract. The court, in this case, interpreted the words "dollars and cents" according to

191

the popular sense and meaning, rather than with a reference to the technical and scientific definition.

If doubts should exist relative to the construction of the word "money" or of the words "dollars and cents," no doubt or hesitation can exist whether by the words "such bank notes as are passing currently in the ordinary course of business," depreciated paper was intended. If the question had been asked, what was the meaning of the phrase "depreciated bank paper," the person to whom the question was proposed, could not have cited a more apposite case, or mentioned a more perspicuous example to illustrate his meaning, than by stating that it was such bank notes as were currently passing in the ordinary course of business in Ohio, during the year 1820.

If the plaintiff should object that the court can not recognize those public and notorious facts, and that parol evidence is inadmissible, I would inquire whether it is a truth self-evident or a legal *maxim, that current bank notes always have been and must continue to be equal in value to specie for the sums expressed to be due on the face of the bank notes, and that the people in general have received and must continue to receive them in payment of debts. Unless those are self-evident truths, it would seem necessary to exhibit testimony to inform the court of the value and description of those notes. Otherwise I can not conjecture how the court could assess with correctness the amount, in damages, of the injury which the plaintiff has sustained from the violation of the contract. A contract is made for the payment, at Cincinnati, of one hundred dollars in bank notes on the bank of the United States at Philadelphia, and the payor has violated his contract: what would be the criterion of damages? Would it not be a sum of money sufficient to purchase one hundred dollars in bank notes of that description? If they should be worth, in the market at Cincinnati, two per cent., one hundred and two dollars would be assessed. If the notes of that bank should not be in existence at the time when the payment should be made (if contrary to the expectations of the parties, the performance became impossible), the consideration or its value should be restored. The word "dollars," in each of those contracts, is not intended to express the value in coin of the bank notes to be paid in performance of the agreements. It is manifestly used for the purpose of describing the amount purporting to be due on the bank notes.

2. Parol evidence is admissible to exhibit to the court the subject matter of the contract, unless the parties have stipulated for the payment of lawful money, or where, by the terms of the agreement, the sum of money to be paid in damages for the non-performance of the contract, is ascertained by express stipulation. Where the parties to an agreement have contracted for the payment of lawful money, and it is admitted in the record or appears from testimony that the money has not been paid, the court will render judgment without the intervention of testimony. The words of the contract ascertain the debt which is due, and the statute prescribes the rate of interest or damages to be paid for the delay of payment.

If the parties to a contract, by express stipulation, assess the sum in damages to be paid for the violation of the contract, evidence would be unnecessary to ascertain that fact which the parties have rendered certain by the terms of the contract.

But if the contract is to be performed by the delivery of other property than lawful money, and if the damages be not liquidated *by the terms of the agreement, inasmuch as the value of [183 property in specie is uncertain and variable, parol testimony is necessarily required to inform the court of the injury which the obligee has sustained, to wit: the value of the property in money, which should have been delivered to him in compliance with the terms of the contract. It is obvious from reading the promissory note on which this suit has been brought, that the phrase "two hundred dollars in current bank notes," is descriptive of ·the aggregate amount purporting to be due on the notes, to be tendered in discharge of the agreement, and are not intended to designate the value, in specie, of those notes.

It can not be contended that the sum, in dollars, is mentioned for the purpose of ascertaining the amount, in damages, to be paid if the contract should not be performed.

The principle for which we contend is not a novelty in judicial proceedings. It has justice for its foundation, and has received the sanction of the courts of justice in England and in the United States—that the words of a contract shall be construed according to the sense in which they are understood by the people in the ordinary transaction of their business, and that if the performance of an agreement has become impossible by an event unexpected and beyond the control of the parties, this mutual mistake shall

not operate to the injury of either party—the consideration or its value shall be restored.

The history of the currency which constituted the circulating medium of the United States during the war of independence, is well known to this court. It consisted of treasury notes; and from the large amount of notes which the necessities of the United States compelled them to issue, without possessing the means of redemption, they gradually depreciated in value until their circulation entirely ceased. The legislatures of the different states, to support the credit of those certificates, enacted laws declaring that they should be a lawful tender in payment of debts. When it was discovered that this description of paper could not be ultimately redeemed, the legislatures of the States of Virginia and Pennsylvania, by legislative acts, repealed the tender laws, and instructed their courts of justice, in the rendition of judgment on contracts made for the payment of lawful money during the time that continental certificates were current, to assess the value, in specie, of the treasury notes at the date of the contract, as the amount of their judgment. This rule was just and equitable. The contract 184] was for the payment *of lawful money of the United States, of Virginia or Pennsylvania, at the time of entering into the contract. The value of property, the subject and consideration of the contract, was estimated in certificates. Had it been valued in gold and silver coin, the sum of money expressed in the contract would have been diminished by a deduction of four-fifths or six-sevenths of the sum mentioned. Would not the seller of the property expect to receive, and the purchaser to pay, depreciated certificates? Could it have been seriously contended that it was the understanding that the purchaser would pay the amount due on the contract in specie to the amount of the sum expressed in the agreement or certificates at his election. With as much plausibility might it be urged that a promissory note for the payment of one hundred dollars in the year 1820, was intended to be discharged by the payment of one dollar or of one hundred dollars, at the election of the payee. Those statutes are declaratory of the principles of justice and equity—that the property of one man shall not be transferred because an event has happened which the parties to a contract did not foresee and which was beyond their control. If an event has happened which leaves a *literal* performance of the contract possible, yet renders the exaction of the literal

194

performance manifestly unjust and contrary to the intentions of the parties, courts of justice interpose and restrain the austere creditor from reaping where he has not sown, and have compelled him to accept of the value of the property with which he has parted. They have compelled him to accept of a substantial performance of his contract. The legislatures of the states are prohibited by their constitutions from the enactment of laws impairing the obligation of contracts. If they were not restrained by constitutional restrictions, no state would arrogate to itself the power of altering or rescinding contracts. Such statutes would be styled laws in favor of falsehood, fraud, and injustice. Would the United States, after resisting, during a long and arduous contest, tyrannical encroachments on the rights of the people—after the achievement of independence, as the first act of legislation, promulgate a law, the benefit of which would be enjoyed by no honest citizens—which offered a premium and reward to the violator of his solemn contracts. Those statutes have received the approbation of the Supreme Courts of Pennsylvania and Virginia, and were declared to be founded in justice, and consistent with good faith in the performance of contracts. 1 Wash. 36; 1 Call, 244; 1 Hen. & Mun. 331, 338; 2 Dallas, 173.

*If the defendant had contracted for the payment of two [185 hundred dollars in current money, the cases cited would justify the court in the admission of the testimony proposed. The words "dollars and money," included in common parlance depreciated paper and specie. Current could with more propriety be predicated of the former than of the latter. Specie in circulation had become scarce, paper money abundant. In the latter, as the standard of the value of property, was buying and selling conducted. There were at least ten dollars in bank paper depreciated in circulation to one in specie.

The presumption, then, arises, that when the words "dollars," or "dollars current money of Ohio," are used in a note or obligation, without explanatory words, depreciated bank paper was intended. If the payee of the note or obligation of similar phraseology should contend that it was intended to be paid in specie or its equivalent, specie-paying bank-notes, the "onus probandi" would rest with the plaintiff. 1 Hen. & Mun. 331; 2 Dallas, 173.

Having established the correctness of the position, that parol

testimony is requisite to explain this contract, the question arises, is the testimony proposed such as would be satisfactory to the court—such as manifests the intention of the parties, and will enable the court to assess equitably the damages sustained by the plaintiff.

On the 25th day of March, 1820, the defendant agreed to pay to the plaintiff " two hundred dollars in current bank notes, such as are passing in the common course of business, on or before the 1st of June, 1822." The expressions "*are* passing," show that they had reference to the currency at the date of the contract. This interpretation is confirmed by directing the attention of the court to the words " on or before." The defendant might have tendered notes passing currently, to wit: depreciated paper, at any time from the date of the execution of the note until the 1st of June, 1822. This proves to the court that the property—the consideration of the contract—must have been valued in depreciated currency. It is absurd to suppose that the owner would estimate the value of his property in specie, and agree that the purchaser might pay for it by tendering two-thirds or three-fourths of the value, or the full amount of the valuation, at his election. It is equally absurd to suppose that this contract was intended, and might have been discharged by the defendant, at his election, either in bank notes equal to specie for the sums expressed to be due on the notes, or in depreciated bank notes. Where the condition of a contract 186] is in the alternative, *some equality is observed in the value of those acts submitted to the choice of the obligor.

" Interpretation ought to be in favor of him who is obliged by the covenant; for he that is obliged, it may be presumed, designed to perform the least, and it was the other's fault that he did not express himself in better terms." Cooper's Justinian, 588, J.

It can not be seriously argued that the contract was in the alternative—that the defendant might either tender specie-paying bank paper or depreciated bank notes, at his election. The latter description of paper possesses every quality required by the expressions of the contract, in a more eminent degree than the former. It was more abundant and common. In it was property valued. If, however, this construction should be doubtful, the above rule of interpretation, founded in good sense and experience,

would give to the contract the meaning contended for by the defendant.

"The beginning and consideration of every contract are to be considered." Cooper's Justinian, 587, C.

The presumption is that the value of the consideration was estimated in depreciated bank notes. At its commencement, and at any time previous to the time when depreciated bank notes ceased to pass currently in the ordinary course of business, this description of currency would have been a tender by the terms of the agreement.

3. Parol evidence is admissible to show and to explain a latent ambiguity in a contract. Philips' Evidence, 410.

When the deed or instrument is sufficiently certain and free from ambiguity, but the ambiguity is produced by evidence of something extrinsic, this ambiguity may be raised and explained by parol evidence. If we were to admit that the contract does not show which of those classes of bank paper above described the parties intended, parol evidence would be admissible to prove to which of these the parties had reference. It was proposed to prove that there were two kinds of notes in circulation, unequal in value. This raises an ambiguity. We then offer parol evidence to show that the depreciated bank paper was intended, by proving that the majority of circulating bank notes was the most current in the ordinary course of business; and from the application of the above rule of construction, that where a contract, from the exhibition of testimony, imports that two acts may be performed, equally described by the terms of the contract, the interpretation most favorable to the obligor shall prevail. We offer to prove that performance of the contract according to the intentions and contemplation of the *parties, became impossible by an [187 event unexpected and beyond the control of the parties. Justice would then require that the consideration or its value should be restored. The evidence proposed shows that the consideration must have been valued in depreciated paper. If the plaintiff receives its value in specie, the agreement will be substantially, if not specifically performed. He expected to receive current bank paper, to be used by him in the payment of debts or in the purchase of property. If he should be paid in specie to the value of this expected paper, the contract will be substantially performed.

J. ALEXANDER, contra:

The contract on which this suit is founded is correctly stated. by the plaintiff in error, and is the one on which the defendant obtained judgment in the court below. But it is contended that the court erred in overruling evidence offered by the plaintiff, because: 1. "The language of the contract imports that other currency was intended than specie, or bank notes passing as specie, for the sums of money apparently due on the face of the notes." 2. That "parol evidence is admissible to show to the court the subject matter of a written contract, unless it be for the payment of lawful money, or the damages be assessed by express stipulation in the agreement." 3. That "parol evidence is admissible to show and explain a latent ambiguity in the contract."

Suppose the three positions taken by the plaintiff shall be admitted as truisms, will they, or either of them, aid him in his objections to the judgment of the court below? I say no. And to test the objections of the plaintiff to the judgment of the court below, in overruling the testimony by him offered, we must examine the bill of exceptions in the record set forth, and also the plea of the plaintiff (defendant below), and by them we shall see what evidence was offered, and whether it was competent under the issue made by the pleadings.

In the first place, whether any bank notes, and what bank notes, were current *at Xenia* (for there payment was to be made), is a fact to be ascertained by proof; and it being part of the "history" of the country that all bank notes were not current, it was important that the plaintiff, in offering to prove that bank notes were current or were not current, to state what kind of notes they were, that the other party might prepare to rebut, if he could do so. It would be necessary, surely, in a plea of tender, for the party in his plea to show the particular kind of bank notes, and I think equally so in this case; otherwise no man could or would say, I presume, that *bank notes, without describing them, were current at a particular time and place. Under this contract, I think, it was important that the plaintiff should have offered to prove, that bank notes were current at Xenia, by the "popular" meaning of the words of the contract; for I presume that it would be deemed idle for him to have offered to prove that bank notes were current in England, France, or *Kentucky*, and to prove their value at any other place than at Xenia.

198

Having thus disposed of the first two objections, I will very briefly answer the third.

That a latent ambiguity may be explained by parol evidence is not denied, but a patent ambiguity can not; and if there is any ambiguity on the face of this contract, it is of the latter kind; and ambiguity must consist in the fact, that whether the plaintiff did or did not pay the amount of his note in the manner and by the time stipulated on the face of it, yet he was never to pay it in money, but by some scale of depreciation unknown on the face of the contract, and equally unknown in the law. Such is the only possible ambiguity which I am able to discover or imagine by reading this contract. The plaintiff might have raised one of another kind if he had tendered bank notes in payment in due time, and a question had been made, whether they were current and passing in the common course of business at Xenia.

These objections to the argument of the counsel for the plaintiff in error are technical, but I think they are well warranted by the record. I am, however, willing to meet the plaintiff in error on the merits of his case; and, as Cæsar, though "a tyrant and a warrior," could not conquer and control "the meaning of words," so I have no fears that this court will change the law of contracts. The plaintiff did not pay his note in the manner, nor at the time or place stipulated on the face of it. Money, therefore, is the end of the law. To give any other construction would be too loose and uncertain for this court to give as a rule of currency in the State of Ohio. It is certainly important that but one currency should prevail in the same government (in the same state at least), whatever brokers and traders may adopt for their own convenience and to suit their own views. Their rules would be but temporary and uncertain at best. I prefer that rule which shall be uniform and permanent, and for such a one I look up to this court with confidence.

Judgment affirmed. For the grounds of the decision, see the opinion of the court in the case of Morris *v.* Edwards, post, 189.